

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-25-00169-CR
_____

LEVARONE ANTWAUN EDWARDS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 3
Tarrant County, Texas
Trial Court No. 1858674

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens

## MEMORANDUM OPINION

A Tarrant County jury found Levarone Antwaun Edwards guilty of manufacture or delivery of four grams or more but less than 200 grams of the following substances: fentanyl, methamphetamine, cocaine, and heroin.[1] Each of the four counts of manufacture or delivery was a first-degree felony offense. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.112(d), 481.1123(d) (Supp.). After Edwards pled true to the State's punishment enhancement allegation, the trial court sentenced him to forty-five years' imprisonment on each count.

On appeal, Edwards argues that the trial court erred by suppressing evidence from searches of Edwards's apartment and cell phone because the affidavits supporting the warrants for the searches lacked probable cause.[2] Edwards also argues that the trial court erred by (1) overruling his challenge for cause to a veniremember, (2) overruling his motions for directed verdict, (3) admitting hearsay, (4) admitting photographs allegedly depicting prior bad acts, and (5) admitting allegedly unauthenticated text messages. We find that (1) the trial court properly overruled Edwards's suppression motions; (2) Edwards failed to establish harm for his challenge for cause; (3) the trial court properly denied Edwards's motions for directed verdict; and (4) that, to the extent Edwards's preserved his complaints, the trial court's evidentiary rulings were not an abuse of discretion. As a result, we affirm the trial court's judgment.[3]

---

[1]Originally appealed to the Second Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (Supp.). We follow the precedent of the Second Court of Appeals in deciding the issues presented. *See* TEX. R. APP. P. 41.3.

[2]Edwards raised ten issues on appeal, which we have renumbered and reorganized.

[3]Edwards also raised a cumulative error complaint. However, because we find no error in the trial court's rulings, we likewise overrule Edwards's cumulative error complaint.

## I.   The Trial Court Properly Overruled Edwards's Suppression Motions

### A.   Factual and Procedural Background

This case involves apartment number 112 of the Sierra Hermosa Apartments (apartment #112) in Tarrant County, which William Snow, an officer with the Fort Worth Police Department (FWPD), believed was being used as a "trap house."[4]  After a confidential informant (CI) conducted a "controlled buy" in apartment #112, Snow executed an affidavit (#112 affidavit) in support of a search warrant for apartment #112, which was located in a "high drug traffic area."  Snow's #112 affidavit contained the following key facts:

- The FWPD received an anonymous Crime Stoppers tip on August 26, 2024, that "pharmaceutical and street drugs [were] being sold daily from" apartment #112 by a black male who had "a lot of tattoos" and went by the nickname "Kiddo."
- On October 11, 2024, "team members were working on an unrelated narcotics investigation" in the same apartment complex, seized drugs from apartment #112, and went to speak to the apartment complex managers about obtaining video-surveillance footage.
- While speaking with management, Daniel Villeneuve, another officer with the FWPD, was approached "by a concerned citizen," who informed Villeneuve that someone in "apartment #112 was selling narcotics."
- On November 19, 2024, the apartment complex staff members informed Officer S. Smith[5] "that the tenant in apartment #112 was still selling narcotics" and, as a result, management was "getting complaints about th[at] activity from residents."
- On January 29, 2025, Officer M. Sims[6] arrested a person who was in possession of fentanyl, and that person wanted to provide information about fentanyl dealers because they were trying "to get sober and want[ed] to see drug dealers arrested."

---

[4]Apartment #112 was leased to Tyeler Varela.

[5]Officer Smith's first name is not mentioned in the record.

[6]Officer Sim's first name is not mentioned in the record.

3

- The person arrested by Sims told Snow that a black male by the nickname "'Kiddo' was selling fentanyl pills from apartment #112."

- The person arrested by Sims provided Snow "with the Facebook profile name for 'Kiddo' which was 'TrapRich Kiddo.'"

- Snow reviewed Kiddo's Facebook profile, which showed a black male fanning $100.00 bills down the length of his arm.

- Snow reviewed images from Kiddo's Facebook page "and noticed that some of the photographs were taken from inside an apartment" that had a layout like the Sierra Hermosa Apartments that Snow had visited.

- In a Facebook photograph, Kiddo was seen posing in a kitchen with "a mason jar filled with a green plant-like substance believed to be mari[h]uana." There was an "AR-15 style rifle" in the kitchen and "a black handgun" in "'Kiddo's' pocket."

- On February 1, 2025, Snow, who was able to recognize narcotics like fentanyl, conducted a "covert surveillance of apartment #112." He saw an "unidentified black female" exit apartment #112 while "holding a clear plastic sandwich baggie in her hand," which contained "small blue pills" that Snow believed were fentanyl "based on the size/shape and years of experience investigating fentanyl dealing."

- Snow contacted a CI, who had provided reliable and credible information in the past, to assist in his investigation.

- While waiting on the CI to arrive, Snow observed Kiddo exit apartment #112 and meet with individuals, some of which "appeared to be narcotics users," in the parking lot for a short period of time, which led Snow to believe "'Kiddo' was conducting narcotics transactions in the parking lot."

- Smith and Villeneuve met with the CI, who was searched, prior to conducting a controlled-narcotics buy, and was given approved monetary funds from the FWPD to purchase fentanyl from apartment #112.

- The CI "proceeded [to] apartment #112 but was stopped by 'Kiddo' who asked what the C[I] needed." When the CI asked for "blues," a common street name for fentanyl, the CI stated that Kiddo said he did not have any. The CI knocked on the door of apartment #112 but received no answer. "While in the parking lot, the C[I] spoke with an unidentified black male who" who told the CI "he could buy the pills from [apartment] #112." The CI gave the unidentified man the approved monetary funds while a person identified as Davante Xavier Ellis Watls walked into apartment #112. The unidentified male returned to the CI and gave him/her small blue pills obtained from apartment #112. Kiddo remained in the parking

4

lot but approached the CI and told him/her that he was "initially suspicious" of him/her but was no longer suspicious after seeing the CI with the pills.

- "'Kiddo' told the C[I] to take down his phone number and to call ahead next time."
- Snow believed that Kiddo and Watls were working together.
- Snow researched the phone number Kiddo gave to the CI and discovered it belonged to Edwards. Snow showed a picture of Edwards to the CI, who identified Edwards as Kiddo.
- On February 2, 2025, Snow had the CI call Edwards to see if they could purchase more pills, and Edwards told him/her "to come by the apartment and to call when he/she was in the parking lot."
- Smith and Villeneuve prepared the CI for another controlled buy after a search of the CI revealed no narcotics.
- Snow saw the CI knock on the door of apartment #112, and "emerge[] a short time later."
- The CI said that he/she met with an unidentified black male who handed the CI a plastic baggie containing eight small blue pills. The CI said that the unidentified male said that someone was always at the apartment and he/she was welcome to just come by.
- The CI returned to meet Smith and Villeneuve and turned over eight small blue pills that were field tested and yielded a "presumptive positive result for fentanyl."
- Snow believed that multiple people were working shifts at apartment #112 "to maximize profits."
- Also on February 2, Snow observed Robert Fields approach apartment #112. After Fields walked away, Snow and Smith "conducted a consensual encounter with Fields" and Fields admitted to having one fentanyl pill in his pocket that he said he had "just purchased from [apartment] #112." The pill was field tested and yielded a presumptive positive result for fentanyl. Fields also said that he had "been obtaining fentanyl pills from [apartment] #112 for the last few months."

After reviewing Edwards's Facebook page, Snow applied for a separate warrant to search Edwards's cell phone. He states in his supporting affidavit (cell phone affidavit) that the warrant for the search of apartment #112 had been signed and that he observed Edwards, who had

5

outstanding misdemeanor warrants, emerge from apartment #112 on February 3, 2025, at approximately 6:40 p.m. Snow states in his cell phone affidavit that he arrested Edwards, who was holding his cell phone during the arrest. The cell phone affidavit describes the drugs and firearms recovered from apartment #112 and contains Snow's statement that "Watls and Edwards both had access to the apartment and were both distributing the [seized] narcotics."[7] Snow's cell phone affidavit states that, during the course of Snow's investigation, he observed Edwards using a cell phone while in the parking lot interacting with individuals Snow "believed to be narcotics customers." It also states that FWPD used a CI to make controlled buys and that Edwards provided the CI with his cell phone number. The cell phone affidavit states that, at Snow's direction, the CI communicated multiple times with Edwards about obtaining more fentanyl. Snow's cell phone affidavit also states that Snow observed Edwards's Facebook posts showing himself with narcotics and firearms and believed that Edwards's cell phone contained evidence related to the case or illegal activities still under investigation.

After reviewing these affidavits and hearing from Snow, the trial court denied Edwards's suppression motions.

---

[7]Specifically, Snow's cell phone affidavit states,

> The search of the kitchen yielded a crystal-like substance believed to be methamphetamine that had a field weight of 188gm (TruNarc scan #14125/14127), small blue pills stamped "M/30" and a purple powder believed to be fentanyl that had a field weight of 94gm (MobileDetect Fentanyl test kit), an off-white powdery/rock substance believed to be Cocaine/Cocaine Base that had a field weight of 50gm (TruNarc scan #14121/14123), a black tar-like substance believed to be heroin (based on training and experience as a narcotics investigator) that had a field weight of 5gm, a wax/liquid like substance believed to be tetrahydrocannabinol (packaging had California warning label stating that this product contains THC) that had a field weight of 4gm, off-white mushroom-like substance believed to be psilocybin mushrooms that had a field weight of 26gm, and 20.5oz (1.2lbs)(based upon training and experiences as a narcotics investigator) a [sic] and a black Smith and Wesson M&P compact 22 (S/N: HJE227C) chambered and additional [nine] live rounds in the magazine.

## B.    Standard of Review and Relevant Caselaw

"We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard." *Martin v. State*, 620 S.W.3d 749, 759 (Tex. Crim. App. 2021).  "We give almost total deference to the trial court's findings of fact and review *de novo* the application of the law to the facts."  *Id.* (quoting *State v. Ruiz*, 577 S.W.3d 543, 545 (Tex. Crim. App. 2019)).  Because no fact findings were made or requested, "we imply the necessary fact findings that would support the trial court's ruling if the evidence, viewed in the light most favorable to the trial court's ruling, supports those findings." *Dahlem v. State*, 322 S.W.3d 685, 688 (Tex. App.—Fort Worth 2010, pet. ref'd) (citing *State v. Garcia–Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008)). "We will uphold the trial court's ruling if it is correct under any applicable theory of law and the record reasonably supports it." *Martin*, 620 S.W.3d at 759.

> In Texas, a search warrant may not be issued unless a supporting affidavit
>
> sets forth sufficient facts to establish probable cause:  (1) that a specific offense has been committed, (2) that the specifically described property or items that are to be searched for or seized constitute evidence of that offense or evidence that a particular person committed that offense, and (3) that the property or items constituting evidence to be searched for or seized are located at or on the particular person, place, or thing to be searched.

TEX. CODE CRIM. PROC. ANN. art. 18.01(c) (Supp.).  Here, Edwards argues that the search warrants should not have been signed by the issuing magistrate because the supporting affidavits were insufficient to establish probable cause.

An issuing magistrate's decision to grant a search warrant should be reviewed with a deferential standard of review.  *Davis v. State*, 202 S.W.3d 149, 157 (Tex. Crim. App. 2006); *Swearingen v. State*, 143 S.W.3d 808, 811 (Tex. Crim. App. 2004).  Warrants should not be

7

invalidated through "hypertechnical" interpretation of their supporting affidavits. *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (quoting *United States v. Ventresca*, 380 U.S. 102, 109 (1965)). "Reviewing courts must give great deference to a magistrate's probable cause determination, including a magistrate's implicit finding." *State v. Baldwin*, 664 S.W.3d 122, 130 (Tex. Crim. App. 2022). "When in doubt, reviewing courts should defer to all reasonable inferences a magistrate could have made." *Id.*

"Probable cause exists when, under the totality of the circumstances, there is a 'fair probability' that contraband or evidence of a crime will be found at the specified location." *State v. Duarte*, 389 S.W.3d 349, 354 (Tex. Crim. App. 2012) (quoting *Gates*, 462 U.S. at 238). "In determining whether a warrant sufficiently establishes probable cause, [a] Court is bound by the four corners of the affidavit." *State v. Elrod*, 538 S.W.3d 551, 556 (Tex. Crim. App. 2017) (citing *Lagrone v. State*, 742 S.W.2d 659, 661 (Tex. Crim. App. 1987); *Lopez v. State*, 535 S.W.2d 643, 647 (Tex. Crim. App. 1976)). "Reasonable inferences may be drawn from the facts and circumstances contained within the four corners of the affidavit." *Davis*, 202 S.W.3d at 154. "[T]he law requires that we defer to a magistrate's reasonable, common[-]sense conclusions in assessing whether to issue a search warrant." *Id.* at 158.

### C.    Analysis

"An affidavit supporting a search warrant begins with a presumption of validity . . . ." *Cates v. State*, 120 S.W.3d 352, 355 (Tex. Crim. App. 2003). Even so, Edwards argues that the affidavits were insufficient to establish probable cause because they relied on hearsay. However, "an affidavit relying on hearsay 'is not to be deemed insufficient on that score, so long as a

substantial basis for crediting the hearsay is presented.'" *Gates*, 462 U.S. at 241–42 (quoting *Jones v. United States*, 362 U.S. 257, 269 (1960)). Whenever a police officer relies on others to supply information concerning an alleged criminal offense, the "informant's 'veracity,' 'reliability' and 'basis of knowledge' are all highly relevant in determining the value of his report." *Id.* at 230. "[T]hese elements should [not] be understood as entirely separate and independent requirements to be rigidly exacted in every case . . . ." *Id.* Rather, the elements "should be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is 'probable cause' to believe that contraband or evidence is located in a particular place." *Id.* "[T]he focus of inquiry is whether the statements are sufficiently reliable for a finding of probable cause . . . ." *Elardo v. State*, 163 S.W.3d 760, 765–66 (Tex. App.—Texarkana 2005, pet. ref'd).

Here, Edwards does not challenge the reliability of the CI. Even so, we note that Snow's #112 affidavit spoke to the reliability of the CI and Snow testified that the CI proved to be reliable and credible because he/she had worked with the CI for approximately one year, his/her information was always true and correct, he/she had completed more than fifteen controlled buys and had "yielded over thousands of pills being seized and also up to kilogram levels of methamphetamine seized." That said, we turn to the four corners of the supporting affidavits.

As for the #112 affidavit supporting the search of apartment #112, Snow swore that the FWPD received a Crime Stoppers tip that pharmaceutical and street drugs were being sold daily in apartment #112 by a black male nicknamed "Kiddo." A few months later, that tip was corroborated by a person arrested by Snow, who also told Snow that a black male nicknamed

9

"Kiddo" was selling fentanyl from apartment #112 and provided Snow with a Facebook profile showing that Edwards went by the nickname "Kiddo." Snow's investigation into Edwards's Facebook profile showed photographs of Edwards posing with marihuana and firearms inside an apartment that looked like the Sierra Hermosa apartments. The #112 affidavit states that Kiddo exited apartment #112 and met with people who Snow thought were narcotics users. The #112 affidavit references a controlled buy where the CI "proceeded to apartment #112 and knocked on the door," and then provided the FWPD with drugs purchased during the controlled buy. Snow also swore that Kiddo told the CI, who was leaving apartment #112, to contact him when looking for drugs and provided the CI with his cell phone number. Snow expressly states that the CI "has been proven to be reliable and credible with the information [he/she] ha[s] provided to [him] in the past." On February 2, 2025, Snow swore that the CI called Edwards, who told the CI to come by apartment #112 to buy drugs, and that the CI made a controlled purchase of drugs on that day.

Snow's #112 affidavit states that the CI, who had provided reliable information in the past, had made a controlled buy after being told to come by apartment #112. Even so, Edwards argues that the #112 affidavit merely states that the CI knocked on the door of apartment #112, not that the drugs were given to the CI inside apartment #112. However, the magistrate could have made a reasonable inference that the CI was given drugs from apartment #112 because the CI received them after knocking on the door after being instructed by Edwards to come by the apartment to pick up the drugs. Further, Snow had conducted surveillance on apartment #112, had seen Edwards exiting apartment #112, and believed from his surveillance that Edwards was

10

selling drugs in the parking lot. After reviewing Snow's #112 affidavit in support of the search of apartment #112, we find that, under the totality of the circumstances, the issuing magistrate had enough information to determine that there was a fair probability that drugs would be found in apartment #112. As a result, we conclude that the trial court correctly determined that the issuing magistrate had probable cause to sign a warrant for the search of apartment #112.

As for the search of Edwards's cell phone, Snow's cell phone affidavit states that the warrant for apartment #112 had been signed and that drugs and firearms were recovered from the apartment when the warrant was executed. The cell phone affidavit shows that Edwards was arrested while holding his cell phone on February 3 after he was seen emerging from apartment #112. Snow swore that he had observed Edwards using a cell phone while interacting with alleged narcotics users and had given the CI his cell phone number with instructions to contact him when the CI wanted drugs. The cell phone affidavit shows that the CI used Edwards's cell phone number while communicating with Edwards about obtaining fentanyl. The cell phone affidavit also references Edwards's Facebook page, and a reasonable inference could be made that Edwards could access his Facebook page and post pictures to the page from his cell phone.

At a minimum, Snow's cell phone affidavit shows that Edwards had communicated with the CI "multiple times" about obtaining drugs using his cell phone. From this information, the issuing magistrate could have determined that Edwards's cell phone contained evidence of a drug transaction, including text messages or calls to or from the CI. *See Stocker v. State*, 693 S.W.3d 385, 387 (Tex. Crim. App. 2024). Moreover, considering the totality of the evidence

11

presented by Snow's cell phone affidavit, we find that the trial court properly determined that the issuing magistrate had probable cause to sign a warrant for the search of Edwards's cell phone.

Because we find that Snow's supporting affidavits contained sufficient evidence for the magistrate to determine that there was probable cause to search apartment #112 and Edwards's cell phone, we find that the trial court properly overruled Edwards's suppression motions. As a result, we overrule Edwards's first point of error.

## II.     Edwards Did Not Establish Harm for His Challenge for Cause

In his second point of error, Edwards argues that the trial court erred by overruling his challenge for cause against a veniremember, who was a former agent for the Federal Bureau of Investigation. The State argues that Edwards failed to preserve this point of error.

As explained by the Texas Court of Criminal Appeals,

> To establish harm for an erroneous denial of a challenge for cause, the defendant must show on the record that "(1) he asserted a clear and specific challenge for cause; (2) he used a peremptory challenge on the complained-of venire member; (3) his peremptory challenges were exhausted; (4) his request for additional strikes was denied; and (5) an objectionable juror sat on the jury."

*Comeaux v. State*, 445 S.W.3d 745, 749 (Tex. Crim. App. 2014) (quoting *Davis v. State*, 329 S.W.3d 798, 807 (Tex. Crim. App. 2010)). Here, the reporter's record does not reflect whether Edwards used a peremptory strike on the objectionable veniremember. In any case, the record shows that the former FBI agent did not sit on the jury and that Edwards affirmatively stated he had no objection to the jury panel. Because the objectionable veniremember did not sit on the jury, Edwards failed to establish harm regarding the trial court's ruling on the challenge for cause. Accordingly, we overrule Edwards's second point of error.

12

**III.    The Trial Court Did Not Err by Overruling Edwards's Motions for Directed Verdict**

In his third point of error, Edwards argues that the trial court erred by overruling his motions for directed verdict for each count.

**A.    Standard of Review**

"We treat a point of error complaining about a trial court's failure to grant a motion for directed verdict as a challenge to the legal sufficiency of the evidence." *Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996); *see Rachal v. State*, 725 S.W.3d 152, 159 (Tex. App.—Fort Worth 2025, pet. ref'd). "In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt." *Rachal*, 725 S.W.3d at 159 (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Bittick v. State*, 707 S.W.3d 366, 368 (Tex. Crim. App. 2024)). "This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* (citing *Jackson*, 443 U.S. at 319; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021)).

"The factfinder alone judges the evidence's weight and credibility." *Id.* (citing Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021)). "We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's." *Id.* (citing *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017)). "Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict." *Id.*

(citing *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence." (quoting *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015)))). "We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution." *Id.* (citing *Braughton*, 569 S.W.3d at 608). "Jurors may choose to believe or disbelieve all, some, or none of the evidence presented." *Id.* (citing *Edward v. State*, 635 S.W.3d 649, 655 (Tex. Crim. App. 2021)).

"To determine whether the State has met its burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by a hypothetically correct jury charge to the evidence adduced at trial." *Id.* (citing *Gutierrez v. State*, 710 S.W.3d 804, 809 (Tex. Crim. App. 2025)). "Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*. at 159–160 (citing *Gutierrez*, 710 S.W.3d at 809). "The law as authorized by the indictment means the statutory elements of the offense as modified by the charging instrument's allegations." *Id*. at 160 (citing *Gutierrez*, 710 S.W.3d at 809).

**B.     The Evidence at Trial**

At trial, Snow testified that FWPD had conducted an investigation, including covert surveillance, into the Sierra Hermosa Apartments due to high drug traffic and violent crime in the area. Snow said that, on February 1, 2025, he saw a woman leaving apartment #112 with a

clear plastic bag that contained small blue pills that Snow believed were fentanyl. Snow then testified about the CI and the controlled buy. Villeneuve testified that he participated in controlled buys at apartment #112 and learned Edwards was dealing drugs out of it. Snow also said that he stopped another person while he was walking away from apartment #112 and seized fentanyl from him.

Snow testified that he executed a search warrant on apartment #112 after witnessing Edwards exit the apartment and that he and Villeneuve arrested both Watls and Edwards. Snow's body-camera footage and photographs from the arrest were introduced. The video footage and photographs from apartment #112 show medicine bottles containing small blue pills that Snow testified were fentanyl, a large pink plastic bag containing a substantial amount of a crystalline white substance that appeared to Snow to be methamphetamine, a plastic bag that contained a black substance, multiple large bags of what appeared to be marihuana, multiple clear plastic bags throughout the kitchen that Snow said appeared to contain crack cocaine, additional methamphetamine, and powder fentanyl, and substances that appeared to be psychedelic mushrooms and black tar heroin. Also present were several digital scales, gelatin capsules that Snow said were "commonly used to package . . . heroin [and] cocaine," firearms, and large sums of money. Snow testified that the drugs were seized and placed into the FWPD Property Room.

According to Villeneuve, Edwards said he was coming from apartment #150 and knew nothing about apartment #112, but Snow testified that he witnessed Edwards come out of

apartment #112. A Facebook photograph[8] from Edwards's account shows him standing in a kitchen of an apartment that looked like apartment #112 with a rifle in the background. Snow testified that he believed Edwards's Facebook photograph was from apartment #112 because both this photograph and photographs of the kitchen during the seizure show that the kitchen had a distinctive teal microwave and that a knob was missing from the same drawer under the kitchen sink. Also, a large blue thermos was next to the distinctive teal microwave in both photographs.

Daniel Donovan, a detective in the Digital Forensics Unit of the FWPD, testified that he conducted a forensic extraction of data from Edwards's cell phone and recovered several text messages. Snow, who believed that Edwards and Watls were dealing drugs together, read the contents of Edwards's text messages, which showed that the user of Edwards's cell phone was informing people that they had cocaine, crack cocaine, methamphetamine, fentanyl, heroin, and other street drugs for purchase.

Rebekah Sweetenham, a forensic scientist for the FWPD Crime Laboratory, testified that she conducted an analysis of some of the items seized from apartment #112. Sweetenham said that she analyzed one of three bags containing a crystalline substance and that her analysis confirmed that the one bag tested was methamphetamine weighing 88.580 grams.[9] Sweetenham said her analysis of two out of four bags of a white powdery substance revealed 11.661 and 16.093 grams of cocaine, while the other two untested bags weighed 14.088 and 3.950 grams. Sweetenham also testified that analysis of another bag of drugs showed that it contained 4.340

---

[8]Snow testified that he executed a search warrant for Edwards's Facebook account

[9]Sweetenham said that the gross weight of the two other untested bags weighed 70.785 grams.

grams of heroin. As for her analysis of the blue pills, Sweetenham said she counted 805 tablets, and evidence shows that each pill weighed 0.108 gram. To test these pills, Sweetenham testified that she conducted a statistical sampling of 28 pills, weighing 3.028 grams, which showed they all contained fentanyl. Although she did not test the remaining 777 pills weighing approximately 78 grams, Sweetenham testified that the statistical sampling showed "with a high degree of confidence, that at least 90 percent of this population [of untested pills] contain[ed]" fentanyl. Snow testified that the amounts of drugs found in apartment #112 were "dealer amount quantities."

During cross-examination, Snow and Villeneuve testified that they did not personally see Edwards selling or possessing any drugs. Although Edwards's text messages indicate otherwise, Snow said it was possible that Edwards was merely a drug user. Snow admitted that he did not check to see who was on the lease for apartment #112 because "drug dealers don't put everything in their name."

After hearing this evidence, the jury convicted Edwards on all four counts of possession with intent to deliver.

### C. Analysis

The State's four-count indictment alleged that, on or about February 3, 2025, Edwards knowingly possessed, with intent to deliver, four grams or more but less than 200 grams, of the following drugs: (1) fentanyl, (2) methamphetamine, (3) cocaine, and (4) heroin. At trial, Edwards argued that there was insufficient evidence of intent to deliver and insufficient evidence that the fentanyl possessed was four or more grams.

17

The evidence shows that Snow conducted surveillance of the apartment complex and opined that Edwards and Watls were selling drugs from apartment #112, which Snow believed was a trap house. Specifically, Villeneuve testified that Snow said he saw "a lot of traffic" from people meeting Edwards in the parking lot for what Snow believed were drug transactions. Snow's opinion was supported by text messages from Edwards's cell phone, which contained evidence of drug transactions, and his Facebook page shows that Edwards identified himself as "TrapRich Kiddo." Snow testified that he observed individuals coming and going from apartment #112 and seized fentanyl from one of them. Snow testified that a CI obtained fentanyl from apartment #112 after knocking on the door and "disappear[ing] out of [Snow's] view for a few minutes." After this purchase, Snow testified that he witnessed Edwards exit the apartment and decided to arrest him. A photograph on Edwards's Facebook page shows him inside the kitchen of apartment #112. In another photograph, Edwards was in possession of a firearm.

"Intent to deliver may be established through circumstantial evidence." *Uzzell v. State*, No. 02-24-00153-CR, 2025 WL 1599970, at *5 (Tex. App.—Fort Worth June 5, 2025, no pet.) (mem. op., not designated for publication) (citing *Jordan v. State*, 139 S.W.3d 723, 726 (Tex. App.—Fort Worth 2004, no pet.)). A defendant's intent is a "question of fact for the jury to resolve" and "may be inferred from the acts, words, or conduct of the accused." *Taylor v. State*, 106 S.W.3d 827, 831 (Tex. App.—Dallas 2003, no pet.); *Uzzell*, 2025 WL 1599970, at *5. "[T]estimony by experienced law enforcement officers may be used to establish [a defendant's] intent to deliver." *Robinson v. State*, 174 S.W.3d 320, 331 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd); *Uzzell*, 2025 WL 1599970, at *5. We may consider several factors in

18

determining such intent, including "the nature of the location where the defendant was arrested", "the quantity of drugs the defendant possessed", the manner of packaging the drugs, "the presence or absence of drug paraphernalia (for use or sale)", "whether the defendant possessed a large amount of cash in addition to the drugs", and "the defendant's status as a drug user." *Jones v. State*, 195 S.W.3d 279, 288 (Tex. App.—Fort Worth 2006), *aff'd*, 235 S.W.3d 783 (Tex. Crim. App. 2007); *Jordan*, 139 S.W.3d at 726; *Uzzell*, 2025 WL 1599970, at *5. "The number of factors present is not as important as the logical force" of all of the evidence. *Moreno v. State*, 195 S.W.3d 321, 326 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd); *see Uzzell*, 2025 WL 1599970, at *5.

We find that there was ample evidence from which the jury could determine that Edwards had the intent to deliver the drugs found in apartment #112, which Snow testified was a trap house. Edwards was arrested after coming out of apartment #112, leaving only Watls behind. The evidence shows that large quantities of drugs were found in the apartment, which Snow testified were "dealer amount quantities." The drugs were packaged in various bottles and plastic bags, and were found along with digital scales, paraphernalia, firearms, and cash. Edwards's status as a drug user was unclear. However, Edwards was arrested with his cell phone, which contained evidence of drug transactions with several people. Although Edwards claimed that he was not involved with apartment #112 at the time of his arrest, Snow testified that he personally witnessed Edwards exiting apartment #112. After considering all of the evidence, we find that it was legally sufficient for a rational jury to conclude that Edwards had the intent to deliver drugs located in apartment #112.

19

As for Edwards's argument that the State failed to prove the weight of the fentanyl, the evidence shows that Sweetenham received 805 pills weighing well over eighty grams total and that statistical analysis demonstrated that at least ninety percent of them contained fentanyl. From this evidence, and from the photographs of the large quantities of blue pills seized in apartment #112, the jury could make a rational determination that the total amount of fentanyl seized weighed four or more grams.

Because the State presented sufficient evidence of Edwards's intent to deliver drugs and sufficient evidence of the weight of fentanyl seized, we find that the trial court properly denied Edwards's motions for directed verdict. As a result, we overrule this point of error.

## IV. The Trial Court's Evidentiary Rulings Were Not an Abuse of Discretion

In his remaining points of error, Edwards challenges the trial court's evidentiary rulings.

### A. Standard of Review

"We review the trial court's decision to admit or exclude evidence under an abuse of discretion standard." *Davis v. State*, 169 S.W.3d 673, 675 (Tex. App.—Fort Worth 2005, no pet.) (citing *Burden v. State*, 55 S.W.3d 608, 615 (Tex. Crim. App. 2001)). "The test for abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action . . . ." *Id.* (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g)). Instead, "it is a question of whether the court acted without reference to any guiding rules or principles, and the mere fact that a trial court may decide a matter within its discretionary authority differently than an appellate court does not demonstrate such an abuse." *Id.* (citing *Montgomery*, 810 S.W.2d at 391). "We will not reverse

a trial court's ruling on the admission of evidence as long as the ruling is within the zone of reasonable disagreement." *Id.* (citing *Montgomery*, 810 S.W.2d at 391).

**B.     Snow's Testimony About How Edwards Became a Suspect Was Not Hearsay**

During Snow's direct examination, the State noted that Snow had received information regarding apartment #112 on November 19, 2024, and asked what the source of the information was. When Snow responded that the source was the apartment complex's management, Edwards objected on hearsay grounds. The State responded that it had not asked a question that would elicit hearsay, that it was not offering the evidence for the truth of the matter asserted, but to explain why Snow took "subsequent action in his investigation." The trial court overruled Edwards's objection and Snow testified that the source of the information was management and a concerned citizen at the apartment complex.

Next, Snow testified that he interviewed persons in possession of narcotics to determine where they purchased their drugs. While Snow started to testify that he spoke to an individual on January 29, Edwards lodged a hearsay objection, which the trial court overruled. Snow then testified that the individual was in possession of fentanyl pills and told Snow where he got the pills from. When Snow testified that the individual provided Snow with a name and that Snow began "investigating that name," Edwards again objected on hearsay grounds, but his objection was overruled.

Edwards argues that the trial court erred by admitting Snow's testimony over his hearsay objections. "The Texas Rules of Evidence prohibit the admission of hearsay evidence except as

21

provided by statute or other rules prescribed pursuant to statutory authority." *Id.* (citing TEX. R. EVID. 802).

"'Hearsay' is a statement, other than one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted." *Id.* (citing TEX. R. EVID. 801(d)). But "a statement not offered to prove the truth of the matter asserted is not hearsay." *Id.* (citing *Dinkins v. State*, 894 S.W.2d 330, 347–48 (Tex. Crim. App. 1995)). "In that regard, the Texas Court of Criminal Appeals has held that statements offered for the purpose of explaining how a defendant became a suspect and not for the truth of the matter asserted are not hearsay." *Id* (citing *Jones v. State*, 843 S.W.2d 487, 499 (Tex. Crim. App. 1992) ("holding testimony of officer explaining how officer came to suspect appellant was not objectionable as hearsay because it was 'not offered to prove the truth of the matter asserted, but to show why the officer got an arrest warrant for and arrested appellant'"), *abrogated on other grounds by Maxwell v. State*, 48 S.W.3d 196, 198 (Tex. Crim. App. 2001)); *Dinkins*, 894 S.W.2d at 347). "Thus, a police officer may testify about anonymous tips received for the purpose of showing why the investigation focused on a particular defendant." *Id.* at 676 (citing *Cano v. State*, 3 S.W.3d 99, 110 (Tex. App.—Corpus Christi–Edinburg 1999, pet. ref'd); *Levario v. State*, 964 S.W.2d 290, 296 (Tex. App.—El Paso 1997, no pet.)). "This is because the testimony assists the jury's understanding of the events by providing context for the police officer's actions." *Id.* (citing *Cano*, 3 S.W.3d at 110).

Here, the record reflects that the State elicited Snow's testimony to show why Edwards became a suspect in Snow's investigation. As a result, the trial court was free to conclude that

22

the evidence was not offered for the truth of the matter asserted. For this reason, we cannot conclude that the trial court abused its discretion by overruling Edwards's hearsay objections. We overrule this point of error.

## C. The Facebook Photographs Were Properly Authenticated

Edwards argues that the trial court erred by overruling his authentication objection to photographs from Edwards's Facebook page showing that he identified himself as "TRAPRICH_KIDDO," and posted photographs of himself with a firearm.[10]

"To properly authenticate an item of evidence, 'the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.'" *Ryder v. State*, 581 S.W.3d 439, 454 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (quoting TEX. R. EVID. 901(a)) (citing *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012)). "Whether the proponent has crossed this threshold is a preliminary determination for the trial court." *Id.* (citing TEX. R. EVID. 104(a); *Tienda*, 358 S.W.3d at 638). "Evidence is properly authenticated if the proponent supplies 'facts that are sufficient to support a reasonable jury determination that the evidence he had proffered is authentic.'" *Id.* (quoting *Tienda*, 358 S.W.3d at 638). "The proponent of the evidence does not need 'to rule out all possibilities inconsistent with authenticity, or prove beyond any doubt that the evidence is what it purports to be.'" *Id.* (quoting

---

[10]Edwards also argues that these Facebook photographs "were evidence of a bad act and were not admissible to prove conformity with character." The State argues that this point is inadequately briefed, and we agree. A "brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). Edwards does not identify in his brief how the photographs depicted any alleged bad act, lacks substantive analysis, and is wholly conclusory. As a result, we find this point inadequately briefed. *See Mosley v. State*, 666 S.W.3d 670, 679 (Tex. Crim. App. 2023); *see also Rodriguez v. State*, No. 08-17-00177-CR, 2019 WL 2710246, at *5 (Tex. App.—El Paso June 28, 2019, pet. ref'd) (mem. op., not designated for publication) (overruling conclusory Rule 404 argument).

23

*Jones v. State*, 572 S.W.3d 841, 848 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (quoting

*Campbell v. State*, 382 S.W.3d 545, 549 (Tex. App.—Austin 2012, no pet.))).

"Rule 901 [of the Texas Rules of Evidence] provides a non-exclusive list of methods for

the authentication of evidence, including witness testimony, appearance, contents, substance, or

other distinctive characteristics taken in conjunction with circumstances." *Id.* (citing TEX. R.

EVID. 901(b); *Campbell*, 382 S.W.3d at 549 ("noting that Rule 901 'does not erect a particularly

high hurdle' and may be satisfied by circumstantial evidence")).

The Fort Worth Court of Appeals has written,

> When the relevant evidence is from an organization's records, generally, the proponent can meet its prima facie authentication burden with an accompanying affidavit confirming that the evidence qualifies as a business record, i.e., that it (1) reflects "[a] record of an act, event, condition, opinion, or diagnosis"; (2) "was [made and] kept in the course of a regularly conducted business activity"; (3) was "made at or near the time of each act, event, condition, opinion, or diagnosis set forth"; and (4) was "made by, or from information transmitted by, persons with knowledge of the matters set forth."

*Fulbright v. State*, No. 02-25-00138-CR, 2026 WL 1501056, at *9 (Tex. App.—Fort Worth

May 28, 2026, no pet.) (mem. op., not designated for publication) (alterations in original)

(quoting TEX. R. EVID. 803(6), 902(10)(B)) (finding that Facebook records were properly

authenticated under Rule 902(10)(B) of the Texas Rules of Evidence).

Edwards argues that Snow did not authenticate the Facebook photographs. However,

pursuant to a search warrant, Facebook returned records attached to a "Certificate of Authenticity

of Domestic Records of Regularly Conducted Activity." The certificate was executed by Alicia

Ramierz Santana, a duly authorized custodian of records for Meta Platforms, Inc. Santana

certified that she had reviewed the records produced by Meta in response to the search warrant

24

for Edwards's Facebook account from August 1, 2024, through February 11, 2025, and that the "records provided are an exact copy of the records that were made and kept by the automated systems of Meta in the course of regularly conducted activity as a regular practice of Meta." Santana further stated that "[t]he records were made at or near the time the information was transmitted by the Meta user." Because Santana's certificate met the requirements of Rule 902(10)(B), the trial court did not abuse its discretion by finding that the Facebook photographs were authenticated. *See* TEX. R. EVID. 902(10)(B); *Ryder*, 581 S.W.3d at 455 (finding that Facebook's "'Certificate of Authenticity of Domestic Records of Regularly Conducted Activity' . . . sufficiently complie[d] with the requirements of self-authentication outlined in Rule 902(10)(B), obviating the State's need to produce additional extrinsic evidence to satisfy the authentication threshold"); *see also Fulbright*, 2026 WL 1501056, at *9.

### D. The Text Messages Were Properly Authenticated

"In a jury trial, it is the jury's role ultimately to determine whether an item of evidence is indeed what its proponent claims," and therefore "the trial court need only make the preliminary determination that the proponent of the item has supplied facts sufficient to support a reasonable jury determination that the proffered evidence is authentic." *Butler v. State*, 459 S.W.3d 595, 600 (Tex. Crim. App. 2015) (citing *Tienda*, 358 S.W.3d at 638).

"As with other types of evidence, text messages may be authenticated by 'evidence sufficient to support a finding that the matter is what its proponent claims.'" *Id*. at 600–01 (quoting TEX. R. EVID. 901(a)). "This can be accomplished in myriad ways . . . including through . . . evidence showing distinctive characteristics." *Id.* at 601 (citing TEX. R. EVID.

901(b)(1)).  For example, "[a] witness might also claim to have knowledge that a text message came from a phone number known to be associated with the purported sender."  *Id.*  "The association of a cell-phone number with a particular individual might suggest that the owner or user of that number may be the sender of a text message."  *Id.*  "Indeed, the suggestion may be quite strong" because "cell phones tend to be personal and user-specific."  *Id.*

Even so, "evidence that merely shows the association of a phone number with a purported sender—*alone*—might be too tenuous" because "a cell-phone number does not necessarily establish the identity of the user at a particular moment in time."  *Id.*  For this reason, "[i]n cases where a sponsoring witness may testify to an association between a cell-phone number and a purported author, other evidence may be available that might bridge the logical gap and permit a proper inference that the purported author sent the message."  *Id.* at 602.

Here, the record shows that Edwards told the CI his cell phone number was "***-***-5952," thereby representing his ownership of the cell phone, and instructed the CI to contact him if the CI needed drugs.  Edwards communicated with the CI using his cell phone, and Snow "researched the phone number and found it belonged to . . . Edwards."  Snow obtained a warrant to search Edwards's cell phone, which was found on his person during his arrest.  Donovan testified he conducted a forensic extraction of data from Edwards's cell phone, which had a cell phone number of "***-***-5952," and that the recovered text messages came from that number.  The text messages themselves show that the person using Edwards's cell phone communicated with multiple people about having drugs like cocaine, methamphetamine, and fentanyl for sale.  The fact that Edwards was found in possession of these drugs at the time he was arrested

26

provided contextual evidence to support a jury's determination that the text messages were sent by Edwards. *See id.* at 604.

We find that the fact that Edwards provided his cell phone number to the CI looking to purchase drugs, held the cell phone in his hand during his arrest, and was found with the same drugs mentioned in the text messages was sufficient to bridge the logical gap such that the jury could determine the text messages came from Edwards. As a result, we conclude that the trial court did not abuse its discretion by making the preliminary determination that the State had admitted sufficient evidence to authenticate the text messages. We, therefore, overrule this last point of error.

## V.    Conclusion

We affirm the trial court's judgment.


Scott E. Stevens
Chief Justice


Date Submitted:     April 29, 2026
Date Decided:       July 24, 2026

Do Not Publish